

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

April 25, 2025

**BY ECF**

The Honorable Alvin K. Hellerstein
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

    Re:    ***United States v. Nicholas Truglia*, 19 Cr. 921 (AKH)**

Dear Judge Hellerstein:

    The Government respectfully submits this letter in advance of the resentencing of Nicholas Truglia ("Truglia" or the "defendant") on April 29, 2025. Truglia was an important participant in the theft of over $20 million worth of cryptocurrency from an individual victim (the "Victim"). At his sentencing on December 1, 2022, the defendant promised to make amends by paying full restitution within 60 days. Instead of making good on that promise, the defendant strung the Victim along with a fantastical tale composed of lies while moving substantial sums of money into an undisclosed account and purchasing luxury items. As set forth in the Revised Presentence Investigation Report dated March 7, 2025 ("PSR"), and in the plea agreement, the Guidelines range is 51 to 63 months' imprisonment. The Probation Office recommends a sentence of 54 months' imprisonment. The Victim requests the maximum sentence permissible to account for the defendant's "blatant fabrications, illegal behavior and the harm he caused." (Suppl. Victim Impact Statement at 1, 9). The defendant argues that the Court should not resentence the defendant at all and, if it does, sentence the defendant to time served. (Dkt. 140 ("Def. Sub.")). For the reasons set forth below, the Government submits that a sentence at the top of the Guidelines range would be sufficient, but not greater than necessary, to achieve the goals of sentencing.

A.    **Background**

    1.    **The Offense Conduct**

    The Court is familiar with the defendant's crime. The defendant and his co-conspirators stole more than $20 million worth of cryptocurrency from the Victim via a "SIM swap." During a typical SIM swap, hackers gain control of a victim's phone number and then use that control to gain access to the victim's online accounts. Once the hackers have such access, they use it for their own financial benefit.

    In this case, on or around January 7, 2018, certain of the defendant's co-conspirators gained control of the Victim's mobile phone number by paying a mobile store employee to link the

Victim's cellphone number to a SIM card that they controlled. (PSR ¶ 17). After gaining control of the Victim's cellphone number, the co-conspirators used that control to gain unauthorized access to certain of the Victim's online accounts, including accounts containing over $20 million worth of the Victim's cryptocurrency, most of which was in the form of a type of virtual currency called Triggers. (*Id.* ¶¶ 18-20).

Once the defendant's co-conspirators gained access to the Victim's cryptocurrency, they recruited others, including the defendant, to join the scheme and help steal that cryptocurrency. (*Id.* ¶ 18). One of the co-conspirators contacted the defendant and asked whether the defendant would allow the co-conspirators to use the defendant's digital trading account at a particular cryptocurrency exchange (the "Cryptocurrency Exchange"). (*Id.*). The defendant agreed and was added to an online video call during which the defendant and the other co-conspirators discussed and coordinated their crime. (*Id.* ¶¶ 18-19). During the call, the defendant learned of the SIM swap and that his co-conspirators had successfully gained access to cryptocurrency worth at least $20 million. (*Id.* ¶ 19). The defendant agreed to join the scheme in exchange for a share of the criminal proceeds. (*Id.*).

Over the next few hours, the defendant allowed his co-conspirators to repeatedly transfer the Victim's cryptocurrency into his account at the Cryptocurrency Exchange. (*Id.* ¶¶ 20-21). In total, the defendant received four transfers of the Victim's Triggers, consisting of approximately 2,121 Triggers, 15,000 Triggers, 28,943 Triggers, and 100,000 Triggers, respectively. (*Id.*). Once the Victim's Triggers were in his account, they were sold for Bitcoin. (*Id.*). After each of the first three transfers and conversions, most of the converted Bitcoin was transferred to the defendant's co-conspirators, with a relatively small amount left for the defendant. (*Id.* ¶ 21). After the fourth transfer, however, the defendant blocked his co-conspirators' access to his account and stopped communicating with them, keeping the entire transfer (worth at least approximately $673,000) for himself. (*Id.*).

   2.   **The Indictment and Arrest**

On or about December 19, 2019, a grand jury sitting in this district returned a two-count Indictment against the defendant in connection with his involvement in the SIM swap of the Victim. Count One charged the defendant with conspiring to commit wire fraud, in violation of Title 18, United States Code, Section 1349. Count Two charged the defendant with conspiring to commit money laundering, in violation of Title 18, United States Code, Section 1956(h).

At the time the grand jury returned the Indictment, the defendant was in state custody in California in connection with a pending state case that involves allegations that the defendant conducted SIM swaps of several victims (unrelated to the Victim in this case) during October 2018. The defendant was arrested in connection with the state case on or about November 14,

2018 and released on bail in April 2020. The defendant made his initial appearance in this case shortly thereafter on or about April 15, 2020.

### 3. The Defendant's Repeated Violations of Pretrial Release Conditions

At the conclusion of the defendant's presentment on April 15, 2020, Magistrate Judge Lehrburger set bail conditions. Among other conditions, the defendant was prohibited from using devices capable of accessing the Internet, such as computers and cellphones.

On March 30, 2021, the Court held a bail hearing to address the defendant's violations of this condition, which related to the defendant's use of Internet-enabled electronic devices to communicate via text message, WhatsApp, and Instagram. During the hearing, Your Honor admonished the defendant:

> Mr. Truglia, by a very slim margin, you are not remanded. That means I am not putting you in jail to await trial. If you're wise, you'll make sure that there are no other even remote possibilities that you have access to the internet, because next time it is highly likely that you will be in jail.
>
> The government in my judgment, is able to prove, by a preponderance of the evidence, that you used the internet, two times at least, and that the use of the internet was to convey a threat along the lines that you are indicted on. If I need to, I can make those findings. And within those findings, there will be no condition or set of conditions that would assure an absence of danger to the community. I am not going to do that, but you should make yourself aware that you escaped jail by the skin of your teeth. Make sure that you comply fully with the conditions which are set.

(Dkt. 29 at 22-23; *see also* PSR ¶ 9).

Despite the Court's grant to the defendant of a second chance, the defendant violated his conditions again. On November 3, 2021, law enforcement responded to an anonymous report of a robbery in progress at the defendant's residence in Florida. Upon arrival at the residence, the officers found the defendant alone. In the residence, the officers found multiple Internet-enabled computers, an Internet-enabled phone, and approximately 6.8 grams of cocaine. The defendant admitted to the officers that he had used a computer to play online video games. When later confronted by his pretrial services officer, however, he lied. He denied accessing the Internet, and he denied telling the officers that he had accessed the Internet. On December 6, 2021, the Court held another bail hearing at which the defendant did not contest the violations. Your Honor remanded the defendant, concluding:

> I remand Mr. Truglia to jail for detention. I find that there is no condition or set of conditions that will assure the safety of the community from crimes like the crimes that Mr. Truglia was convicted of.
>
> He had transgressed in the past by not heeding the condition of not having access to the internet. He violated before and he violated again. If I keep him at home, he'll likely do it a third and fourth and fifth time. So he will be in detention.

(Dkt. 46 at 16-17; *see also* PSR ¶¶ 10-12).

### 4. The Plea Agreement and the Guidelines Calculation

On October 28, 2021, the defendant pleaded guilty, pursuant to a plea agreement (the "Plea Agreement"), to Count One of the Indictment, which charged him with participating in a conspiracy to commit wire fraud, in violation of Title 18, United States Code, Section 1349, in connection with his involvement in the cyber intrusion of the online accounts of the Victim and theft of the Victim's cryptocurrency. On December 13, 2021, Your Honor accepted the defendant's guilty plea.

The Plea Agreement set forth the following calculation of the offense level under the United States Sentencing Guidelines:

(1) A base offense level of 7 pursuant to U.S.S.G. § 2B1.1(a)(1);
(2) A 20-level increase, pursuant to U.S.S.G. § 2B1.1(b)(1)(K), because the loss amount exceeded $9,500,000, but was less than $25,000,000; and
(3) A three-level decrease, pursuant to U.S.S.G. § 3E1.1(a) and (b), for acceptance of responsibility.

In accordance with the foregoing, the applicable Guidelines offense level in the Plea Agreement is 24. In the plea agreement, the parties agreed that Truglia had no prior convictions as of the date of the agreement. (PSR ¶ 6). The PSR determined that, after the plea agreement was entered, the defendant was convicted of theft by unlawful taking in Monmouth County Superior Court, which resulted in one criminal history point. (*Id.* ¶¶ 68-71). Nevertheless, the Guidelines calculations in both the plea agreement and the PSR resulted in a Guidelines range of 51 to 63 months' imprisonment. (*Id.* ¶¶ 6, 136).

As part of his Plea Agreement, Truglia was required to forfeit $983,010.72 in United States currency, representing proceeds that were transferred to the defendant's digital currency account as part of the scheme. On November 30, 2022, the Court signed a consent preliminary forfeiture order entering a money judgment in that amount. (Dkt. 60).

### 5. The Original Sentencing

On November 2, 2022, the parties appeared for sentencing. (Dkt. 57).[1] The Court adjourned the proceeding because Truglia had failed to provide relevant information, including

---

[1] A copy of the Government's sentencing submission filed via email with the Court on or about August 25, 2022, is enclosed as Exhibit A.

financial information, to the Probation Office. (*See id.* at 11-12). The Court emphasized, "What is fairly asked and what I now make clear is I want to know what are the assets, where are they located, and how do we get access to them?" (*Id.* at 13). The Court explained that "[p]art of the issue of accepting responsibility is to make repayment to the person who was the victim of a theft." (*Id.* at 11; *see also id.* at 20 ("[W]illingness to pay a just debt is going to be an indication of acceptance of responsibility"). The Court adjourned sentencing to November 30, 2022, to allow time for Truglia to gather relevant information and provide it to the Probation Office.

On November 28, 2022, the Probation Office issued a revised Presentence Investigation Report, which reflected Truglia's ownership of assets worth $61,830,828.10, including cryptocurrency, luxury watches, diamond jewelry, and NFTs, and a total net worth of $61,771,702.10. (Dkt. 59 ¶ 78). The revised Presentence Investigation Report reflected that Truglia acknowledged that he had sufficient means to pay restitution. (*Id.* ¶ 85).[2]

On November 30, 2022, the parties appeared again for sentencing. (Dkt. 65). During the proceeding, the defendant confirmed his ability to pay restitution to the victim. (*Id.* at 45 (". . . he's willing . . . within 30 days to pay the 12 million, but thereafter he can pay within 60 days the remainder of the restitution that the government calculates")). The Court thereafter adjourned the sentencing until the following day to allow time for Truglia's counsel to prepare a treatment plan for Truglia. (*Id.* at 46).

On December 1, 2022, the Court resumed sentencing. (Dkt. 67). During the proceeding, the Court signed a consent order of restitution, which was signed by Truglia and incorporated the amounts and payment terms discussed the previous day (the "Restitution Order"). (Dkt. 61). Specifically, the Restitution Order required that Truglia pay a total of $20,379,007 in restitution, with $12,100,000 due and payable on or before December 31, 2022, and $8,279,007 due and payable on or before January 30, 2023. (*Id.*). The Court sentenced Truglia to a term of 18 months' imprisonment, to be followed by a term of three years' supervised release. In explaining the grounds for an incarceratory term of 18 months, which was substantially below the applicable Guidelines range of 51 to 63 months, the Court noted that the defendant's prompt payment of restitution was a significant factor. (*See* Dkt. 67 at 15 ("I'm impressed by the willingness that you have shown in paying back the victim . . . I think the right sentence is 18 months. It takes into consideration what I've said about you making restitution . . . .").

On December 19, 2022, the Court issued the judgment, which reflected Truglia's restitution obligation of $20,379,007 and provided that $12,100,000 of that obligation was due within 30 days

---

[2] On or about December 22, 2022, the Probation Office issued an updated Presentence Investigation Report, which corrected the date on which Truglia was arrested in connection with a California state prosecution. (Dkt. 64). The listing of Truglia's assets, his total net worth, and his acknowledgement of sufficient means to pay restitution were not changed. (*Id.* ¶¶ 78, 85).

from the filing of the judgment. (*See* Dkt. 63 at 6-7). The judgment further made Truglia's payment of his restitution obligation a special condition of his supervision. (*Id.* at 5).[3]

### 6. Truglia's Post-Sentencing Conduct

On or about December 27, 2022, Truglia signed a settlement agreement with the Victim, in which the defendant promised to pay the full restitution amount to the Victim in Bitcoin on or before December 30, 2022. (GX 48).[4]

On or about December 29, 2022, Truglia was released from federal custody and began service of his term of supervised release in the Middle District of Florida.

On or about May 9, 2023, a search warrant was executed at the defendant's residence in Florida by officers with the Ocoee Police Department ("OPD") and detectives with the Los Angeles County Sheriff's Department. (PSR ¶ 40). Before entering the residence, officers saw Truglia exit a vehicle with luggage in his hand. (*Id.*). Truglia informed an OPD officer that he had just returned from attending the Formula One Racing Championship in Miami, Florida, which is located in the Southern District of Florida. (*Id.*). Truglia noted that he had traveled to Miami on May 3, 2023, and that he did not have permission to do so from his Probation Officer. (*Id.*). During a search of Truglia's residence, law enforcement found seven boxes of ammunition in a gun safe located in one of the bedrooms. (*Id.*). Law enforcement also found two fraudulent New York State driver's licenses and two United Kingdom driver's licenses, all affixed with Truglia's photograph and listing personal identifying information for other individuals. (*Id.*). Truglia was placed under arrest. (*Id.*).

On or about May 15, 2023, the Probation Office issued a Violation of Supervised Release report dated May 15, 2023 ("VOSR Report"). (PSR ¶ 42). The VOSR Report alleged that the defendant had violated conditions of his supervised release by (1) committing a federal crime, to wit, possession of ammunition following a felony conviction; (2) committing a state crime, to wit, possession of ammunition following a felony conviction; (3) committing a state crime, to wit, criminal use of personal identification information in connection with his possession of fraudulent driver's licenses; (4) travelling out of the Middle District of Florida without permission; (5) failing to make a good faith effort to pay his restitution obligation; (6) failing to truthfully answer an inquiry from his Probation Officer regarding his efforts to obtain employment; and (7) failing to follow the instructions of his Probation Officer to provide weekly job search logs. (*Id.*).

On July 10, 2023, Truglia was arraigned on the seven specifications in the VOSR Report. (Dkt. 80). Truglia admitted travelling out of the Middle District of Florida (*i.e.*, Specification 4) and denied the other specifications. Thereafter, the Court held evidentiary hearings on September

---

[3] On or about August 2, 2023, the Court issued an amended judgment to fix the clerical error of failing to list in the original judgment the second required tranche of restitution (*i.e.*, payment of $8,279,007.00), which tranche was included in the Restitution Order. (Dkt. 82; Dkt. 84 at 13-14).

[4] "GX" refers to a Government exhibit introduced during the hearings conducted on September 18, September 21, and November 7, 2023. "Tr." refers to the transcript of the hearings on those dates.

18, September 21, and November 7, 2023. At the hearings, the Government established that the defendant had knowingly and willfully failed to pay his restitution obligations. Among other things, the evidence showed:

- On or about January 9, 2023, Truglia texted his friend Bennett Genovesi that Truglia did not need a job because he did not "need money," he was "good for a while," and had "eight figures," in other words, at least $10 million. (Tr. 125-26: GX 53 at 11).

- While on supervised release, Truglia's Probation Officer discussed Truglia's restitution obligation with Truglia more than five times, during which discussions Truglia repeatedly signed documents that detailed his obligation. (*See* Tr. 3-9; GX 33 ("Financial Agreement Payment Instructions" signed by the defendant on January 11, 2023, and February 6, 2023); GX 32 (Letter from Government signed by the defendant on April 11, 2023)).

- Between on or about January 26 and on or about February 24, 2023, Truglia transferred over $220,000 into a Wells Fargo bank account that he did not disclose to the Probation Department in a financial disclosure form signed by Truglia under penalty of perjury. (*See* Tr. 35-36; GX 49; GX 30). Truglia used much of the money, which included revenue from the sale of a luxury watch and transfers from multiple cryptocurrency exchanges, to buy luxury items (from, among others, Louis Vuitton, Bape, and Supreme), fund his brokerage account, and make transfers to cryptocurrency exchanges. (*See e.g.*, Tr. 40-41; GX 49).

- On or about March 27, 2023, the defendant reported owning over $382,000 in Zcash, a form of cryptocurrency. (GX 30 at 4 (financial disclosure form); *see also* Dkt. 64 ¶ 78 (reflecting Truglia's reporting of $426,373 in Zcash); GX 43 (image sent by defendant to Bennett Genovesi on January 6, 2023, showing account holding $424,689 worth of Zcash)).

At a conference on February 29, 2024, the Court held that the defendant's failure to pay his restitution obligation was willful. (Dkt. 120 at 27 ("I hold that these failures to pay were willful"); 28 ("[T]he proof amply supports [the Probation Office's] finding" that the defendant "failed to make a good-faith effort to pay the court-ordered restitution"); (29-30 ("I take the inference from Truglia's failure to fully disclose his assets a willfulness, a failure to abide obligations he took upon himself"). The Court elaborated:

> Over the past 11 months, instead of paying anything to [the Victim], Truglia has been able to fund a lifestyle well beyond his evident means and never explained to the probation officer or to the Court how he could do it. Indeed, he hid his assets. Truglia's Wells Fargo bank account, which Truglia omitted from his financial disclosure form, represents the nut of the problem. A statement in that account reflects monies coming in and out from cryptocurrency platforms. All of a sudden it seems Mr. Truglia found his key. It also reflects purchases for luxury and nonessential goods, months after he defaulted on his restitution obligation. He bought luxury sneakers, Yeezys, Louis Vuitton luggage, designer hoodies, Supreme apparel, sold . . . watches for $92,000. Of course these assets don't

amount to $20 million, but Mr. Truglia's failure to give account to what he had and favoring his own indulgences over his obligation to pay is indicative of his intent never to pay his debt, his willfulness. This is not a case of indigence. This is not a case of inability to pay.

(*Id.* at 28). The Court found that it had the power to resentence the defendant but deferred resentencing and instead signed an Order on Civil Contempt, directing that the defendant would remain incarcerated until such time as he satisfied his obligations to make the restitution imposed by the Court or established that he had taken all *bona fide* steps available to him to satisfy his restitution obligation. (*Id.* at 31-32; Dkt. 109).

On or about May 29, 2024, the defendant filed a sealed letter with the Court. In the letter, the defendant requested bail so that he could pursue a "plan" to satisfy his restitution obligation. The defendant proposed, among other things, to provide "full, current, candid, and corroborated financial disclosure" and pledged to "be diligent in searching for employment," claiming that he expected "to soon receive a letter offering employment from a reputable business."

On October 15, 2024, the Court held a conference at which the Court confirmed that the defendant had not as of that date paid a single cent toward his restitution obligation. (Dkt. 123 at 4). The defendant admitted that he had not by that date provided full, current, candid, and corroborated financial disclosure; and that he had transacted in cryptocurrency after entry of the Restitution Order. (*Id.* at 13, 21). The defendant requested release from custody so he could, among other things, "start making money . . . and start making some restitution."[5] The Court rejected the defendant's request that he be released from custody, noting that the defendant's "story" regarding his inability to access his cryptocurrency was "fanciful." (*See id.* at 43).

On November 12, 2024, the Court signed an Order releasing the defendant from civil confinement, "having considered the length of time and the conditions in which the Defendant has been jailed, and having considered that Defendant may more efficiently pursue restitution efforts if released." (Dkt. 122).

---

[5] During the conference on October 15, 2024, defense counsel stated his understanding that the defendant had approximately $80,000 in stock, which was held in accounts at Wells Fargo that had been frozen by the Government. (Dkt. 123 at 5). I stated my understanding that the Government had not frozen the accounts. (*Id.* at 6). In fact, in or around May 2023 and September 2023, my Office's Financial Litigation Unit had served Wells Fargo with restraining notices concerning accounts held by the defendant at Wells Fargo, at which time the accounts held a combined total of approximately $47,600. (*See* Dkt. 75, 76, 87). Despite the restraining notices, in or around 2024, approximately $47,600 was transferred out of the accounts. According to the defendant, this transfer occurred without his knowledge or consent by one or more inmates who extorted the defendant while he was in custody at the Metropolitan Detention Center ("MDC") in Brooklyn. Following an April 2024 investigation by MDC into the alleged extortion, MDC concluded that Truglia was indeed extorted for money and jewelry by one or more fellow inmates.

On December 11, 2024, the Court held a conference at which the Court scheduled a resentencing and advised the defendant that the defendant had "90 days to make [the defendant's] situation better."

To date, Truglia has made no restitution payments. (PSR ¶¶ 47-48, 146).[6]

**B.   Discussion**

   **1.   Law on Resentencing**

A fine or payment of restitution is delinquent if a payment is more than 30 days late. 18 U.S.C. § 3572(h). A fine or payment of restitution is in default if delinquent for more than 90 days. 18 U.S.C. § 3572(i). Pursuant to Title 18, United States Code, Section 3613A(a)(1):

> Upon a finding that the defendant is in default on a payment of a fine or restitution, the court may, pursuant to section 3565, revoke probation or a term of supervised release, modify the terms or conditions of probation or a term of supervised release, *resentence a defendant pursuant to section 3614*, hold the defendant in contempt of court, enter a restraining order or injunction, order the sale of property of the defendant, accept a performance bond, enter or adjust a payment schedule, or take any other action necessary to obtain compliance with the order of a fine or restitution.

18 U.S.C. § 3613A(a)(1) (emphasis added). Section 3613A(a)(2) further provides that in determining what action to take under Section 3613A(a)(1), "the court shall consider the defendant's employment status, earning ability, financial resources, the willfulness in failing to comply with the fine or restitution order, and any other circumstances that may have a bearing on the defendant's ability or failure to comply with the order of a fine or restitution."

Section 3614(a) states that if "a defendant knowingly fails to pay a delinquent fine or restitution the court may resentence the defendant to any sentence which might originally have been imposed." 18 U.S.C. § 3614(a). Section 3614(b), however, adds an additional requirement before a court may resentence a defendant to imprisonment. Pursuant to Section 3614(b)(2), a court may do so if the court determines that "in light of the nature of the offense and the characteristics of the person, alternatives to imprisonment are not adequate to serve the purposes of punishment and deterrence." Section 3614(b)(1) offers an alternative path to imprisonment in the case of a delinquent fine—in that situation, a court may also imprison if "the defendant

---

[6] On October 15, 2024, the defendant consented to forfeiture of five items of jewelry and a watch case (the "Forfeited Jewelry") that were received in evidence during the hearings before the Court. (Dkt. 123 at 45). On January 30, 2025, the Court signed a final order of forfeiture as to the Forfeited Jewelry. (Dkt. 130). The Forfeited Jewelry has been transferred to the United States Marshals for appraisal and liquidation. After the jewelry is liquidated, the Government can attempt to use the restoration process to restore the forfeited funds to the Victim, which would result in reduction in the amount of restitution outstanding.

willfully refused to pay the delinquent fine or had failed to make sufficient bona fide efforts to pay the fine." The statute has no similar alternative path where, as here, the issue is restitution. *See United States v. Bengis*, 03 Cr. 308 (LAK), Transcript of July 19, 2017 Hearing at 29 ("[T]he plain language of the statute seems to indicate that imprisonment may be imposed for knowing failure to pay restitution, and that a finding of willfulness is not necessary for that purpose."). Nevertheless, at least one court has acknowledged the possibility that an appellate court presented with the question might interpret the statute to include a requirement of willfulness in a case involving failure to pay restitution. *Id.* (noting "the possibility that a higher court might take a different view of [Judge Kaplan's] reading of the statute"). The Second Circuit does not appear to have made a definitive ruling on the question. *Compare United States v. Hurtado*, 756 F. App'x 63, 68 (2d Cir. 2018) ("[I]mprisonment for failure to pay restitution is permitted only if a defendant 'willfully refused' or 'failed to make sufficient bona fide efforts to pay,' or else 'alternatives to imprisonment [would not be] adequate to serve the purposes of punishment and deterrence.'"), *with United States v. Rutigliano*, 887 F.3d 98, 107 (2d Cir. 2018) ("[O]nly a willful failure to pay restitution can result in incarceration."), and *United States v. Colasuonno*, 697 F.3d 164, 180 (2d Cir. 2012) (upholding Your Honor's decision to revoke probation for a "willful violation" of restitution obligations).

In sum, a court has broad discretion to fashion an appropriate remedy in its effort to obtain compliance with a restitution order, including by imposing an additional term of imprisonment, an additional fine, additional restitution, or an additional forfeiture sum, as all of the above were available to the Court at the time of the original sentencing. *See, e.g.*, *United States v. Chusid*, 275 F. App'x 69, 70 (2d Cir. 2008) (affirming above-Guidelines fine imposed at resentencing where defendant directed funds abroad to avoid a court order).

### 2. The Defendant's Failure to Pay Restitution Was Willful and the Defendant Should be Resentenced Accordingly

The defendant's willful failure to pay restitution and his contemptuous conduct to avoid doing so warrant resentencing in this case. The Court should reject the defendant's meritless arguments against such a resentencing.

Contrary to the defendant's repeated claims that Section 3614 is "rarely applied" and a resentencing would be "novel," (Def. Sub. at 2, 7), numerous courts, including this Court, have relied upon the statute to resentence where, as here, a defendant willfully failed to pay the defendant's restitution obligation. *See, e.g.*, *United States v. Colasuonno*, 697 F.3d 164, 180 (2d Cir. 2012) (affirming Your Honor's resentencing of defendant to four months' incarceration after original sentence of probation); *United States v. Chusid*, 275 F. App'x 69, 70 (2d Cir. 2008) (affirming resentencing of defendant to 41 months' imprisonment after original sentence of 37 months imprisonment); *United States v. Henricks*, 658 F. App'x 813, 817 (7th Cir. 2016) (affirming resentencing of defendant to 151 months' imprisonment after original sentence of 121 months' imprisonment); *United States v. Johnston*, 595 F.3d 292, 296 (6th Cir. 2010) (affirming resentencing of defendant to 51 months' imprisonment after original sentence of 25 months' imprisonment); *United States v. Bengis*, No. 03 Cr. 308 (LAK), 2017 WL 3605496, at *1

(S.D.N.Y. July 20, 2017) (resentencing defendant to 57 months' imprisonment after original sentence of 46 months' imprisonment)).[7]

The defendant's own authorities undermine his claim that a resentencing would cause double jeopardy concerns. (Def. Sub. at 2-3). In *United States v. Kyles*, 601 F.3d 78, 83-84 (2d Cir. 2010), the Second Circuit explained that "double jeopardy does not bar a court from modifying a sentence" that carries no legitimate expectation of finality. *Id.* (rejecting contention that orders altering a restitution schedule impermissibly modified a defendant's sentence and quoting *United States v. DiFrancesco*, 449 U.S. 117, 137 (1980), for the proposition that "Congress has established many types of criminal sanctions under which the defendant is unaware of the precise extent of his punishment for significant periods of time, or even for life, yet these sanctions have not been considered to be violative of the Clause"). Here, the defendant has no legitimate expectation of finality where Congress has passed a law that explicitly states that a court "may resentence the defendant to any sentence which might originally have been imposed" if "a defendant knowingly fails to pay a delinquent fine or restitution" and where courts, including this Court, have applied that statute to resentence defendants to additional periods of incarceration.

The defendant's contention that "he was never told" that he could be resentenced does not change the outcome. (Def. Sub. at 3). Whether he was told or not, the defendant was on notice that he could be resentenced. In the defendant's plea agreement, the defendant agreed to make restitution in accordance with 18 U.S.C. §§ 3663, 3663A, and 3664. Section 3664(o) makes clear that "[a] sentence that imposes an order of restitution is a final judgment notwithstanding the fact that . . . the defendant may be resentenced under section 3565 or 3614." At his plea, the defendant confirmed that he read the plea agreement before he signed it, discussed it with his attorney, and understood its terms. (Dkt. 39 at 16). The combination of the notice given to the defendant at the time of his plea, the clear statutory language, and the line of cases resentencing defendants for similar conduct renders illegitimate any expectation the defendant had of finality. *See DiFrancesco*, 449 U.S. at 139 ("Although it might be argued that the defendant perceives the length of his sentence as finally determined when he begins to serve it, and that the trial judge

---

[7] The defendant claims that Section 3614 has been cited "just four times in New York district courts." (Def. Sub. at 7). This is wrong. *See, e.g.*, *United States v. Silver*, No. 20 Cr. 360 (AKH), 2024 WL 5154075, at *1 (S.D.N.Y. Dec. 18, 2024); *United States v. Bengis*, No. 03 Cr. 308 (LAK), 2017 WL 3605496, at *1 (S.D.N.Y. July 20, 2017); *United States v. Teeple*, No. 13 Cr. 339-2 (VEC), 2016 WL 1328939, at *2 (S.D.N.Y. Apr. 5, 2016); *Gambino v. United States*, No. 97 Cv. 2976 (HB), 1997 WL 639041, at *1 (S.D.N.Y. Oct. 15, 1997); *United States v. Porcello*, No. 22 Cr. 29 (KAM), 2024 WL 4242206, at *1 (E.D.N.Y. Sept. 19, 2024); *United States v. Kestenbaum*, 908 F. Supp. 2d 364, 369 (E.D.N.Y. 2012); *United States v. Barskie*, No. 02 Cr. 975 (NGG), 2007 WL 1756133, at *4 (E.D.N.Y. June 18, 2007); *United States v. Brill*, No. 99 Cr. 0827 (NGC) (LP), 2007 WL 2274668, at *2 (E.D.N.Y. Aug. 6, 2007).

The statute has also been cited at least seven times by the Second Circuit. *United States v. Rutigliano*, 887 F.3d 98, 107 (2d Cir. 2018); *United States v. Colasuonno*, 697 F.3d 164, 180 (2d Cir. 2012); *United States v. Pescatore*, 637 F.3d 128, 144 (2d Cir. 2011); *United States v. Chusid*, 275 F. App'x 69, 70 (2d Cir. 2008); *United States v. Chusid*, 372 F.3d 113, 115 (2d Cir. 2004); *United States v. Hurtado*, 756 F. App'x 63, 68 n.3 (2d Cir. 2018); *United States v. Carpenter*, 320 F.3d 334, 343 (2d Cir. 2003).

should be prohibited from thereafter increasing the sentence, that argument has no force where . . . Congress has specifically provided that the sentence is subject to appeal. Under such circumstances there can be no expectation of finality in the original sentence." (internal citations omitted)).

The imposition of restitution, like the imposition of a term of supervised release, forms a part of the sentence that imposes certain obligations on the defendant, and Congress has created a clear statutory regime that provides for certain consequences that flow from a defendant's failure to comply with these obligations. In the case of a failure to pay the ordered restitution, one of the consequences is that the Court may resentence the defendant pursuant to Section 3614. This no more violates the Double Jeopardy Clause than does the imposition of a term of imprisonment upon a violation of supervised release. "The requirement that a defendant only be punished once for a particular crime does not mean that this punishment cannot be modified or extended." *United States v. Pettus*, 303 F.3d 480, 487 (2d Cir. 2002) (rejecting argument that revocation of supervised release violates Double Jeopardy's bar on multiple punishments for the same offense).

The Court should also reject the defendant's claims that Section 3614 violates his rights to indictment, trial by jury, and presumption of innocence. (Def. Sub. at 3-5). Unlike the statute at issue in *United States v. Haymond*, 588 U.S. 634 (2019), Section 3614 does not allow the Court to find facts that increase "the legally prescribed range of allowable sentences." To the contrary, Section 3614(a) explicitly cabins the sentence that may be imposed at resentencing to "any sentence which might originally have been imposed." Here, the Court was authorized at the original sentencing to sentence the defendant to any period of incarceration up to 20 years; Section 3614 does not alter that range.

Nor does Section 3614 in any way "conflict with basic federal statutory sentencing principles." (Def. Sub. at 5-6). Section 3614(b)(2) does not, as the defendant claims, "direct" a court "to evaluate only the 'nature' of the offense and the 'characteristics' of the person in deciding whether imprisonment is required" or limit a court to consideration of the goals of punishment and deterrence in determining the length of the sentence. (Def. Sub at 5). Instead, the statute merely limits the circumstances in which a court may resentence a defendant to a term of imprisonment— a defendant may be resentenced to imprisonment only if the court determines "in light of the nature of the offense and the characteristics of the person, alternatives to imprisonment are not adequate to serve the purposes of punishment and deterrence." In other words, the statute requires that a court consider certain factors but in no way prohibits the court from considering the other factors applicable at sentencing set forth in Title 18, United States Code, Section 3553(a). Accordingly, there is no conflict.

### 3. A Sentence at the Top of the Guidelines Range Would Be Just

As established by the record before the Court, the defendant worked with others to steal millions of dollars from the Victim and thereafter has engaged in a sustained campaign to deceive this Court and re-victimize the Victim. In light of the nature of the defendant's offense and his characteristics, alternatives to imprisonment are not adequate to serve the purposes of punishment and deterrence. Rather, a serious sentence of incarceration at the top of the Guidelines range is necessary to reflect the nature and circumstances of the offense; the history and characteristics of

the defendant; and the need for the sentence to promote respect for the law, provide adequate punishment, protect the public, and provide for deterrence.

There is no dispute that the defendant is in default on his payment of restitution or that the defendant was keenly aware of his obligation to pay restitution. Furthermore, the evidence amply supports the Court's conclusion that the defendant's failure to pay restitution has been both knowing and willful. Even setting aside the Bitcoin the defendant claims he is unable to access, the evidence shows that the defendant had assets to pay restitution but chose not to do so:

- First, both before and after sentencing the defendant reported holding substantial amounts of non-Bitcoin digital assets, including other forms of cryptocurrency and digital art. Indeed, in a financial affidavit completed in December 2021, the defendant reported owning over $10 million worth of assets separate and apart from the 3,196 Bitcoin he now claims he is unable to access. (PSR ¶ 116). Despite repeated instructions to provide a full accounting, the defendant provided no documentation to explain what happened to these assets. (PSR ¶ 117). The defendant now claims that he liquidated the assets in 2023—that is, *after* entry of the restitution order. (PSR ¶ 120). He does not provide documentation to corroborate his account or explain why he did not use the proceeds to pay his restitution obligation.[8]

- Second, the defendant said he had the money. On January 9, 2023—that is, after the defendant was released from serving his sentence—the defendant texted Genovesi that the defendant did not need a job because he did not "need money," he was "good for a while," and had "eight figures," in other words, at least $10 million. (Tr. 125-26: GX 53 at 11).[9]

- Third, between January 26 and February 24, 2023, the defendant transferred over $220,000 into a Wells Fargo bank account that he did not disclose to the Probation Department. (*See* Tr. 35-36; GX 49; GX 30). The defendant used much of the money to buy luxury items (from, among others, Louis Vuitton, Bape, and Supreme), fund his brokerage account, and make transfers to cryptocurrency exchanges. (*See e.g.*, Tr. 40-41; GX 49).[10]

---

[8] The support document the defendant did provide to the Probation Office was for a previously undisclosed account at blockchain.com, which the defendant claims to be using to cover his living expenses. (PSR ¶¶ 117, 132). Left unexplained is where the defendant got the Bitcoin in that blockchain.com account.

[9] The defendant's claim that he did not need a job is corroborated by his failure to seek or gain employment after serving his sentence and by his disregard of his Probation Officer's directions concerning the same. (*See* Tr. 13-18; GX 25; GX 26 (reflecting that the defendant's job search did not begin until March 29, 2023)). The defendant now claims to have found employment, but it is not clear whether he has started or at what physical location he is employed. (PSR ¶ 113).

[10] The over $220,000 included revenue from the sale of a luxury watch and transfers into the defendant's Wells Fargo account from multiple cryptocurrency exchanges. (*See* GX 49).

- Fourth, the defendant is a sophisticated cryptocurrency thief. In this case, the defendant and his co-conspirators stole over $20 million worth of cryptocurrency during a single hack. The evidence of the defendant's crime included electronic communications and post-arrest statements about his participation in other heists. The evidence also included photographs taken before the defendant's arrest that reflected a luxury lifestyle, involving private jets, diamond-encrusted jewelry, bottles of expensive liquor, and stacks of cash and devices used to store cryptocurrency.[11]

In light of the above and contrary to the defendant's claim that there is "zero evidence" that he can pay restitution, (Def. Sub. at 7), there is ample basis to conclude that the defendant continues to have and hide substantial assets available to him to pay restitution. Indeed, as the Court has found, "[t]his is not a case of indigence." (Dkt. 120 at 28). Accordingly, the Court should leave in place the existing Restitution Order.[12]

As for the Bitcoin the defendant claims he cannot access, the defendant offers no reason to upset the Court's conclusion that the defendant's account is a "fanciful" ruse. (Dkt. 123 at 43). Indeed, the defendant's story continues to evolve. At sentencing, the defendant initially reported that the Bitcoin was stored online, (Dkt. 57 at 13), but then claimed that it was stored in a "Bitcoin wallet." (Dkt. 64 at ¶ 79). Now, the defendant claims that the Bitcoin is accessible via a nano ledger. (PSR ¶¶ 54, 119). But the defendant refused to tell the Probation Office where this nano

---

[11] In the Victim Impact Statement, the Victim explains reasons to believe that the defendant appeared in a television news program in 2020 with his identity obscured and stated that he could serve a period of incarceration and then enjoy the cryptocurrency he had stolen. (Suppl. Victim Impact Statement at 1-2). For the reasons set forth in this letter, the Court need not make any additional findings in this regard as the record separate and apart from such an appearance already amply supports the Court's finding that the defendant willfully failed to pay his restitution obligation and is not indigent.

[12] Even if there was reason to conclude that the defendant is currently indigent—which there is not—the Court could and should conclude, based on the evidence outlined above, that the defendant did not make reasonable efforts to make restitution payments when he could do so and therefore should be resentenced to a lengthy term of incarceration. A defendant cannot evade justice simply by dissipating assets on luxury items. *See United States v. Vitek Supply Corp.*, 151 F.3d 580, 584 (7th Cir. 1998) (rejecting argument that it was "too late for the district judge to do anything in response" to a defendant's efforts "to make itself judgment-proof," noting that Section 3613A(a)(1) grants courts "authority to deal with defendants that thumb their noses at criminal fines"); *see also United States v. Kestenbaum*, 908 F. Supp. 2d 364, 369 (E.D.N.Y. 2012), *aff'd and remanded*, 552 F. App'x 74 (2d Cir. 2014) ("The test for revocation of probation under *Bearden* is not whether the probationer is indigent, but rather whether the probationer 'has made all reasonable efforts to pay . . . .'" (quoting *Bearden v. Georgia*, 461 U.S. 660, 668 (1983)).

ledger is located or whether he knows the 24-word seed phrase to access the Bitcoin in the nano ledger. (PSR ¶ 54).

Likewise, the defendant still has not provided any other information to support his story or undermine the sworn and corroborated testimony introduced at the hearings before Your Honor, such as the full name or contact information for the person he claimed was present when he gave one set of seed words to Genovesi and later accompanied the defendant in an attempt to get those seed words from Genovesi. (Tr. 65-67, 80). Instead, the record continues to reflect the defendant's willingness to lie. For example, the defendant claimed that he obtained the Bitcoin during a transaction with Kraken, a cryptocurrency exchange; according to Kraken, however, the defendant was not their customer and any transaction of the sort claimed by the defendant would not have happened in the manner he described. (*See* Tr. 75-76). Furthermore, in an attempt to buttress his story, the defendant gave the Victim's lawyers a fraudulent trade confirmation. (*See* Tr. 81-85; GX 36; GX 37; GX 59). Other information the defendant provided—for example, the public key for the wallet he claims is his and the number of Bitcoin in the wallet—was available to anyone who, like the defendant, had access to the Internet, wanted to look up the list of richest Bitcoin wallets, and then claim the wallet was theirs. (*See* GX 63).

At the sentencing in this case, the Court trusted the defendant when he represented that he wished to make amends for his crime, and the Court, believing that the Victim's financial loss would soon be remedied, responded by imposing a sentence far below the applicable Guidelines range. It is now clear that the defendant acted in bad faith, deceiving the Court and the Victim and compounding the harm he had already caused. The Court should not countenance such egregious conduct and should sentence the defendant accordingly.

**C.    Conclusion**

The defendant helped steal over $20 million worth of cryptocurrency from the Victim. In the years since, he has repeatedly lied to the Victim, the Court, and the Probation Office. For all the foregoing reasons, the Court should resentence the defendant. At resentencing, the Government respectfully submits that the Court should leave in place the existing Restitution Order and impose a sentence at the top of the Guidelines range of 51 to 63 months' imprisonment.[13]

Respectfully submitted,

JAY CLAYTON
United States Attorney

By:    /s/
Timothy V. Capozzi
Assistant United States Attorney
(212) 637-2404

cc:    Mark Gombiner, Esq.

---

[13] As with the previous judgments issued by the Court in this case, the Court should not waive the requirement that the defendant pay interest on the restitution amount. *See* 18 U.S.C. § 3612(f).