# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

Tamara Giwa
*Executive Director and*
*Attorney-in-Chief*

*Southern District of New York*
Jennifer L. Brown
*Attorney-in-Charge*

June 6, 2025

Hon. Alvin K. Hellersteiin
United States District Court
Southern District of New York
United States Courthouse
500 Pearl Street
New York, New York 10007

Re: **United States v. Nicholas Truglia**
    **19 Cr. 921 (AKH)**

Your Honor:

There should not be a re-sentencing for Mr. Truglia's 2020 conviction for conspiracy to commit wire fraud.  If there is a re-sentencing, the only just punishment is a sentence of time-served.

## THERE SHOULD NOT BE A RE-SENTENCING FOR MR. TRUGLIA'S 2020 CONVICTION FOR CONSPIRACY TO COMMIT WIRE FRAUD

On April 29, 2025, the Court declared that Mr. Truglia's "original sentence [for conspiring to commit wire fraud] has to be changed because of the defendant's wilful failure to pay restitution." *April 29, 2025 Transcript* at 12.  This is not true. Mr. Truglia does not have to be re-sentenced for his role in a wire fraud conspiracy to address post-sentence issues with payment of restitution.  To the contrary,  as already argued to the Court, any re-sentencing for the 2020  wire fraud conviction based on post-sentence conduct would denigrate Mr. Truglia's double jeopardy and due process rights.

We very strongly urge the Court to reconsider its decision to proceed with a wire fraud res-sentencing. The original 18 month sentence imposed by the Court on December 1, 2022 was not some raw transactional bargain in which Mr. Truglia purchased a lower sentence by promising to pay $20,000,000 in restitution (roughly 40 times as much as he gained from the offense). Rather, the Court's sentence was the product of its thoughtful and careful assessment of all the Sec. 3353(a) factors, including Mr. Truglia's limited role in the offense, his psychological issues, and the need to avoid unwanted sentencing disparities.[1] Although Mr. Truglia's willingness to pay restitution was surely an important consideration, the sentence was based on all of the 3553(a) sentencing factors. *December 1, 2022 Transcript* at 15.

Mr. Truglia has now served the entirety of the 18 month custodial sentence imposed by the Court. Since his release from that sentence, he has spent an additional 13 months in prison, including about eight months for contempt, based on his alleged wilful failure to pay restitution.

Given this background, a re-sentencing for wire fraud conspiracy would be unprecedented[2] and a constitutional travesty. Mr. Truglia's case is unique. Counsel is

---

[1] None of the other participants in the conspiracy, including Ellis Pinsky, the mastermind of the offense, have even been charged with a crime.

[2] At argument on April 29, 2025, the Court cited just one case before rejecting Mr. Truglia's constitutional arguments, *United States v. Colasuonno*, 697 F.3d 164 (2d Cir. 2012). T. 10. The Court characterized *Colasuonno* as an "affirmation of a case of [the Court's where the defendant had willfully failed to pay restitution and I sentenced him to a term of incarceration and supervised release on the underlying substantive crime." T. 10.

The Court's characterization of *Colasuonno* does not comport with the decision of the Second Circuit or the available record below. In an Order Imposing Sentence, this Court stated that it was resentencing Colasuonno for his violation of the conditions of his probation. *United States v. Colasuonno*, 05-cr-1110, Dkt. 122 (in "order imposing sentence," noting that Colasuonno had not paid restitution in "violation of the conditions of his probation," and citing 18 U.S.C. § 3565(a)(2) for revoking a sentencing of probation and resentencing the person). Indeed, this Court's order imposing sentence on the violation of probation did not even mention the statute at issue here, 18 U.S.C. § 3614. *Id.* The basis for this Court revoking his probation was 18 U.S.C. § 3565(a)(2). *Id.*

The Second Circuit's decision also makes clear that *Colasuonno* related to a violation of probation. *United States v. Colasuonno*, 697 F.3d 164, 169 (2d Cir. 2012). In describing what occurred below, the Circuit explained:

The court…imposed special conditions on Colasuonno's probation, confining

not aware of any case where a court sought to resentence a person well after their term of incarceration was final to a new term of incarceration on the original offense.. T. 4 (the Court characterizing the proceedings as a "resentencing of the original sentence").

That the Court has threatened to resentence Mr. Truglia to 20 years, a sentence that would be more than 13 times longer than his original sentence of 18 months – without due process and in violation of his double jeopardy rights is extraordinary and emphasizes the need for reconsideration. The threat of a twenty year sentence is even more shocking because there is no evidence that Mr. Truglia has the present ability to pay the restitution order.[3]

There is a simple and constitutional alternative. One of the conditions of Mr. Truglia's supervised release is that he pay restitution. If the Court wants to sanction Mr. Truglia for not meeting his restitution obligations, the right approach is to find that Mr. Truglia violated a condition of his supervised release and impose a sentence for that violation.

## THE PURPOSE OF RESTITUTION HAS ALREADY BEEN LARGELY SATISFIED.

A wire fraud re-sentencing for a post-sentence failure to pay restitution is especially unwarranted because the purpose of restitution–to make the victim whole–has already been satisfied. See *United States v. Boccagna*, 450 F.3d 107, 117 (2d

---

him to his home for 46 months and requiring him to pay restitution to the Internal Revenue Service ("IRS") in the amount of $781,467....For almost a year after sentencing, Colasuonno made not a single payment toward the restitution ordered by the district court. This prompted the district court to issue a summons requiring Colasuonno to appear and to answer a charge that he had failed to abide by a condition of his probationary sentence. *Id.*

*Colasuonno*, therefore, did not address either constitutional issue relevant in Mr. Truglia's case. There was no double jeopardy concern because Colasuonno was being sentenced for a violation of probation.

[3] Mr. Truglia's Bitcoin wallet is now worth more than $300 million dollars. If Mr. Truglia had the ability to access his wallet, he would obviously have paid the restitution. The notion that he would choose to risk more prison rather than pay a tiny fraction of his wealth is preposterous.

3

Cir. 2006); *United States v. Dawson*, 250 F.3d 1048, 1050 (7th Cir. 2001) (restitution cannot award the victim a "windfall').

Here, as demonstrated below, .the loss amount from the offense is significantly less than that found in the PSR and the amount of restitution already received by Mr. Terpin is much greater than that reflected in the PSR. As established below, the correct restitution amount for Mr. Truglia is about nine million dollars.

In 2019, Mr. Terpin received 562 bitcoins from Ellis Pinsky, the architect of the theft. Those Bitcoin are worth more than sixty million dollars today. Mr. Terpin also has obtained a $75 million judgment against Mr. Truglia; a $22 million judgment against Mr. Pinksy, and has a pending loss suit against A.T..T which seeks damages of $240 million dollars for allowing the theft to happen.

Mr. Terpin and his lawyers recent Supplemental Victim Impact Statement, **Exhibit A,** strongly suggests that they are using this case for goals other than restitution. Mr. Terpin demands that the Court sentence Mr. Truglia to the "maximum sentence permissible." To support this request, Mr. Terpin claims that Mr. Truglia had "bragged on a nationwide television show that he didn't mind spending a few years in jail because he still had Bitcoin." Mr. Terpin goes on to provide a supposed quote from Mr. Truglia and a hyperlink to the alleged 'nationwide television show."

As detailed below, Mr. Terpin's letter, which the Court found "enormously disturbing" is a knowing and egregiously unethical falsehood. The "nationwide television show" cited by Mr. Terpin is, in fact, a barely watched YouTube video produced by someone identified only as "Crumb."

The fact that Mr. Terpin and his counsel would attempt to persuade the Court to impose a 20 year sentence on Mr. Truglia based on a blatant falsehood raises a substantial question as to whether Mr. Terpin should be treated as a victim at all for purposes of restitution.

**IF THERE IS GOING TO BE A RE-SENTENCING, MR. TRUGLIA OBJECTS TO THE LOSS AMOUNT CALCULATION; THE AMOUNT OF RESTITUTION ATTRIBUTABLE TO MR. TRUGLIA; THE SENTENCING GUIDELINE RANGE; AND THE FINDING THAT MR. TRUGLIA HAS ASSETS OTHER THAN HIS BITCOIN WALLET WITH WHICH TO PAY RESTITUTION.**

If the Court does go forward with a re-sentencing, it must be a plenary proceeding. *See United States v. Rose*, 379 F. Supp. 3d 223, 232 (S.D.N.Y. 2019) (noting that "[a] plenary resentencing hearing carries with it all of the procedural trappings and collateral effects of the original sentencing—in addition to mandatory application of § 3553(a) factors to new facts, a full resentencing would allow the parties to raise or re-raise arguments that are unrelated to the issue(s) that precipitated the resentencing, including any non-retroactive changes in the law."). Accordingly, if Mr. Truglia is to be re-sentenced for his wire fraud conviction, he is not bound by any prior agreement or lack of objection as to the loss amount, the amount of restitution, or any other aspect of the Presentence Report.

**THE CORRECT LOSS AMOUNT FROM THE OFFENSE IS $17,639,000**

**Background**

On January 7, 2018, Ellis Pinsky, then 15, and someone named "Harry" hacked into Michael Teripin's cell phone through a "Sim swap." Mr. Terpin is an extremely wealthy cryptocurrency pioneer. After hacking into Mr. Terpin's phone, Pinsky was able to gain access to some of Mr. Terpin's online crypto accounts.. He transferred to his own accounts various crypto currencies–3,000,000 Triggers, 20,000 Sky coins, and 12, 500 Steem coins. PSR, par. 17,18; Terpin Victim Impact Statement, page 12, **Exhibit B.**

At the time of the theft, there were about 32,000,000 Triggers in circulation and Mr. Terpin owned about 10% of that amount. Like most altcoiins, Triggers were not backed by any assets and, as far as counsel can tell, do not seem to have had any intrinsic value or purpose As illustrated by the attached chart, **Exhibit C**, for most

of its brief existence, Triggers had minimal value.   For example, just a couple of weeks before the theft, Triggers ranked 202 in terms of cryptocurrency valuation and were tradiing at a nominal value of $1.31. .

Pinsky, however, was lucky enough to stumble upon Mr. Terpin's wallet during the one very brief period when  Triiggers were actually worth something.  Starting in late December of2017, Triggers, for reasons that are not apparent,  shot up like a rocket.  On January 4, 2018,  Triggers closed at an all time high of $8.94.[4] **Exhibit D, page 6**

Because Triggers was a small, obscure altooin, it was traded on only a few crypto exchanges, one of which was Binance.  But, Pinksky didn't have an account with Binance and wasn't able to open one because of his age.   Accordingly, once he stole the Triggers on January 7,  Pinsky needed to find people with with a Binance account who would agree to convert the Triggers  it into Bitcoin and return the Bitcoin to Pinsky.

To solve this problem, Pinsky sent out a call on a private Twitter account to people who were in a group of computer hackers called the Community.  A number of people, including Mr. Truglia, responded and agreed to help Pinsky.

Pinsky first sent Mr. Truglia three relatively small transfers of Triggers and Mr. Truglia traded the Triggers for Bitcoin and returned the Bitcoin to Pinsky, minus a small fee.  In the early morning of January 8, Pinsky  sent Mr. Truglia 100,000 Triggers. This time, however, Mr. Truglia converted the Triggers to Bitcoin, but kept the Bitcoin for himself.

**The Triggers Stolen by Pinsky were Worth only about $5.53 a Trigger  When Converted to Bitcoin.**

---

[4] Also like a rocket, Triggers had an equally steep downward trajectory.  On January 7, 2018, Triggers closed at 6.73., a decline of 25% in just three days.   As shown in the attached chart, this descent continued unchecked overt next several months. By October of 2018, Triggers ceased to have any value at all.

Triggers is listed as closing at at $6.73 on January 7, 2018. **Exhibit D.** However, Mr. Truglia did not get $673,000 worth of Bitcoin for the 100,00 Trigger that Pinky sent him.. Rather, as shown by the attached screenshot taken on January 8, he was only able to convert the Triggers into 34.957 Bitcoins. **Exhbit F.** At the time of the conversion, Bitcoin was trading at !5,802.28 dollars. **Exhibit F.** Thus, the 100,000 Triggers received by Mr. Truglia from Pinsky converted into Bitcoin valued at only $552,686.07.

.

The PSR states that Mr. Terpin suffered a total loss of cyrptocurrency valued at $22,6660.007.39 dollars. PSR, par. 22. This number is based on the proposition that the Triggers stolen from Mr. Terpin were worth $20,190,000 (3,000,000 times $6.73).

The PSR is worng. The 3,000,000, Triggers taken from Mr. Terpin could not have been sold for $6.73 a Trigger. In fact, there does not seem to have been any method at all for converting Triggers directly into dollars. Rather, the Triggers had to be converted into Bitcoin on the Binance. exchange. But, as demonstrated above, exchanging Triggers for Bitcoin yielded a value of only about $5.53 per Triigger. Accordingly, the total value of the Triggers stolen from Mr. Terpin amounts to $16, 590,000.

The PSR does not set forth a value for the Steem and Skycoin cryptocurrencies stolen from Mr. Terpin. However, in his first Victim Impact Statement, **Exhibit B,** page 11, Mr. Terpin asserts that the value of the Steem and Skycoin crypotocurrencies totalled 1,049,000. Id. Accepting Mr. Terpin's valuation of his Steem and Skycoin, the total loss amount should be calculated as $17, 639,000.

## THE CORRECT RESTITUTION AMOUNT ATTRIBUTABLE TO MR. TRUGLIA IS $8, 653,000.

The restitution amount established for Mr. Truglia is wrong because it is derived from an inflated loss amount. It is also wrong because it undervalues the amount of restitution Mr. Terpin has already received.

In December of 2018, Mr. Terpin and his lawyers learned of Mr. Truglia's involvement in the offense. Shortly thereafter, they figured out that Ellis Pinsky was the actual cryptocurrency thief.

Around New Year's eve of 2018,, Mr. Pinsky's mother received an email from one of Mr. Terpin's lawyers, advising her that they knew her son was the mastermind of the theft. Almost immediately Mr. Pinsky's mother retained high-priced legal counsel, John Siffert of Lankler, Siffert and Wohl.

Just a few weeks later, Mr. Pinksy, through counsel, voluntarily returned everything he had gained from the theft. He gave Mr. Terpin all of the 562 Bitcoins he had netted from the theft, plus $100,00 in cash and a Patek watch. The 562 Bitcoins turned over to Mr. Terpin were approximately half of the total proceeds from the theft.[5]

The Probation Office and the government agree that the Bitcoins and other property turned over by Pinsky should be credited towards the amount of restitution owed by Mr. Truglia.[6] However, the PSR says that Mr. Truglia is only entitled to a $2,281,000 credit against restitution for the Bitcoins, cash and watch given to Mr. Terpin by Pinsky. This calculation is apparently based on the value of Bitcoin on February 8, 2019.

Using the price of Bitcoin on February 8, 2019 to calculate the extent to which Mr. Terpin has been made whole does not make sense. On January 7, 2018, Mr. Terpin suffered a loss of 3,000,000 Triggers which were then worth about 1,050 Bitcoins. A year later, he got back 562 Bitcoins from Pinsky even though the Triggers were now worthless. Accordingly, for purposes of restitution, the offset for the money returned by Pinsky should be calculated based on the 562 Bitcoins value at the time of the theft, plus the $100,00 in cash–$8,985,520.

---

[5] Despite the repayment, Mr. Terpin subsequently sued Mr. Pinsky in federal court and ultimately settled the suit with Mr. Pinksy agreeing to a judgment of $22 million dollars against him. As part of the settlement, Mr. Pinsky also agreed to assist Mr. Terpin in his 240 million dollar lasuit against A.T.T. for their alleged negligence in allowing the theft to occur. *Terpin v. A.T.T.*, 18 Civ. 6975-ODW-KS (CCCA).
[6] *11/30/22 Sentencing Transcript* at 40.

The 562 Bitcoins Mr. Terpin got from Pinsky are now worth more than sixty millions dollars.  Indeed, although it does not excuse the crime, Mr. Terpin has objectively benefitted  from the theft of his Triggers.  Using the unusually low value of Bitcoin on February 8, 2019 as the measure of Pinsky's restitution would result in a windfall for Mr. Terpin that is contrary to the purpose of restitution.

For the above reasons, the correct amount of restitution is $8,,653, 480.00–the total loss amount of 16, 690,000 minus the 8,985,530 restitution from Pinsky.

## THE CORRECT GUIDELINE RANGE IS 3-9 MONTHS IMPRISONMENT
.

The Preesentence Report determines that Mr. Truglia has a sentencing guideline range of 51-63 months based on an Adjusteed Offense level of 24 and a Criminal History Category of I.  PSR, pars. 66, 72.   The offense level calculation, however, is derived entirely from Mr. Truglia's participation in the wire fraud conspiracy and uses the exact same calculations from the original sentence..

The offense level calculation is wrong.  The sole purpose of the purported "re-sentencing" is to punish Mr. Truglia for his supposed wilful failure to pay restitution "The original sentence has to be changed because of the defendant's wilful failure to pay restitution." *April 29, 2025 Transcript* at 12.  The guidelines applicable to a 2018 wire fraud conspiracy are not a basis for determining the appropriate sentence for a 2023 alleged failure to pay restitution.

If the Court is going to impose a new sentence for wilful failure to pay restitution, it must apply the guidelines relevant to that conduct.   But, there is no sentencing guideline for "willful failure to pay restitution" because there is no such federal crime.  Nor, is there any sentencing guideline for Title 18, U.S.C. sec. 3614. The sentencing guidelines provide that "if the offense is a felony for which no guideline expressly has been promulgated, apply the most analogous offense guideline." U.S.S.G. sec. 2X5.1.  On the dubious assumption that "wilful failure to pay restitution" is some sort of felony, the most analogous guideline is found in

U.S.S.G. secs. 7B1.3 and 7B1.4.    Mr. Truglia's alleged failure to pay restitution constitutes a Grade C violation of the terms of his supervised release.  The guidelines for a Grade C violation with a Criminal History Category of I is 3-9 months..[7]

## MR. TERPIN'S SUPPLEMENTAL VICTIM IMPACT STATEMENT FEATURES A DELIBERATELY FALSE AND HIGHLY INFLAMMATORY ALLEGATION ABOUT MR. TRUGLIA

At the April 29, 2025 proceeding, the Court declared that it found a recent letter from Mr. Terpin and his counsel which "has disturbed me enormously." *April 29, 2025 Transcript* at 22.  That letter claims that Mr. Truglia "bragged on a nationwide television show that he didn't mind spending a few years in prison because he still had Bitcoin." **Exhibit A**, page 1.  The Court went on to quote the entirety of a section from the letter captioned

**Truglia admitted to the scheme of flaunting the court and refusing to pay restitution."**

Mr. Truglia's behavior towards the Court and me was premediated, as shown by his appearance on an episode on "VICE" on Showtime. These Teenagers Wouldn't Stop Robbing Millionaires Although he did not show his face in this episode, Mr. Truglia is credited on IMDB for an appearance in the documentary. https://www.imdb.com/title/tt11634154/ (Nicholas Truglia played by Nicholas Truglia).

In that documentary Mr. Truglia said that planned to stay in jail for up to a decade so that he could spend the cryptocurrency he amassed freely when he was released. As Truglia states in the documentary, *"It really wouldn't be that many years. It's not like murder. It's really just like a decade at most is what people look at, and even then I'd still have my money when I got out because it's bitcoin. It's not like a bank account. They can't take the money. I mean obviously it would suck to go to jail for a decade.*

---

[7] At the April 29th proceeding, the Couurt suggested that it was considering denying Mr. Truglia credit for acceptance of responsibility and recalculating the guideline range as 70-87 months. *April 29, 2025* Transcrip at22.This would be patent error.

At the Deecmber 1, 2022 sentnecing, the Court adopted the PSR's guideline range of 51-63 months which included the finding thatMr. Truglia accepted responsibility for his role in the wire fraud offense. This conclusion cannot be revisited based on alleged post-sentencing conduct that has nothing to do with wire fraud.  There is no precedent for such an illogical approach.

*But, um, uh, the way I have everything set up I don't think that
will happen."* (Documentary at 31:15.)
   *Against this background, which clearly shows Mr. Truglia's
intent, his pattern of fabrication, evasions, and delay makes
perfect sense. Mr. Truglia always intended to try to fool those who
attempted to hold him responsible for his actions. His was a
callous and premeditated plan and he had no genuine sympathy for me
or his other victims.*
**Exhibit  at 2.**

   After reading Mr. Terpin's  letter, the Court asked counsel "So what do you
think a sentencing judge has in mind when he reads something like that, Mr.
Gombiner?  The Court then declared  that , based on the "quote" in the letter it was
considering imposing a new sentence of 20 years imprisonment. *April 29, 2025
Transcript* at 24..

   Mr. Terpin's claim that Mr. Truglia admitted to flaunting the Court and
refusing to pay restitution is a pure and knowing lie.  *These Teenagers Wouldn't Stop
Stealing from Millionaires* is not an episode from "VICE" on Showtime.   Rather, Mr.
Terpin has cited the Court to  a YouTube video produced by someone identified only
as "Crumb."[8]

   At 31:15  of Crumb's video, there is a ten second clip in which a cartoon
character using a disguised voice purports to be speaking as Mr. Truglia.   The clip is
identified only as coming from an unnamed and undated "VICE" documentary.

   On March 29, 2020, VICE aired  a documentary entitled *"Keepers of the Caliphate
and SIM Kids."*  Neither counsel for Mr. Truglia nor the government has seen the
VICE documentary because it is no longer posted on the internet.  Accordingly, there
Accordingly, there is no way to know if  the clip shown by "Crumb" even comes from
the VICE documentary.  There is no way to know the context of the alleged quote
and/or the question that prompted it.  Indeed, there is no evidence that Mr. Truglia
spoke the quoted words at all.

   What we do know is that Mr. Truglia, was in custody in California from
December 13, 2018 to April 8, 2020.  PSR, par. 76..   On December 13, 2018, no one,
ncluding Mr. Truglia  had been accused,  either civilly or criminally, with stealing Mr.
Terpin's cryptocurrency.   Thus, there is zero possibility that any comments on the

---

[8] Because "Crumb" is unidentified, we do not know if he has any connection,
financial or otherwise, to Mr. Terpin.

VICE documentary could have had anything to do with the Terpin theft, let alone the proceedings in this Court.which did not begin until 2020.

In short, the portion of Mr. Terpin's letter cited by the Court as "enormously disturbing" and possibly warranting twenty years in prison should be stricken from the record   Other than casting doubt on Mr. Terpin's status as a "victim," the deliberate falsifications in his letter should play no part in any resentencing.

## THE PRESENTENCE REPORT MISSTATES THE AMOUNT OF ASSETS OTHER THAN BITCOIN THAT MR. TRUGLIA HAS IN HIS POSSESSION TODAY OR HAD WHEN HE WAS SENTENCED ON DECEMBER 1, 2022.

Paragraph 78 of the 2025 Presentence Report asserts that at the time of Mr. Truglia's December 1, 2022 sentencing he had Ethereum, XMR Monero and Cardano cryptocurrency with a total value of about $8 million.  Paragraph 120 of the PSR claims that Mr. Truglia failed to list these cryptocurrency assets in his March 9, 2025 financial affidavit.

In the Sentencing Recommendation Section on the 2025 PSR, the Probation Office states that at Mr. Truglia's December 1, 2022 sentencing, his lawyer "acknowledged Truglia's total assests of $61,800, 000.   The Recommendation goes on to claim "even with the value of the 3,196 Bitcoin subtracted from the total assets amount, the defendant had over $39 million, more than enough to fully satisfy the order of restitution."   PSR, par. 43.

The 2025 PSR is wrong about Mr. Truglia's possession of Monero, Cardano and Ethereum and his possession of $39 miillion dollars other than his Bitcoin.

On November 29, 2022, Mr. Truglia's counsel sent a very detailed email to USPO Johnny Kim.   The email stated that Mr. Truglia now longer owned the Cardano, Ethereum and Monero currencies.   **Exhibit F.**  At sentencing, Mr. Truglia's counsel told the Court that those currencies were no longer in Mr. Truglia's possession and that his total assets were about $53 million, almost all of which was in his Bitcoin wallet. *11/30/2022 Transcript* at 4-6.

Mr. Truglia does not have the cryptocurrencies cited in the PSR and he did not have them at his 2022 sentencing.  The PSR's statement that he had or has assets other than his Bitcoin wallet with which to make $20,,000,000 of restitution is wrong.

## CONCLUSION

There should not be a re-sentencing for Mr. Truglia's 2020 conviction for conspiracy to commit wire fraud.  Mr. Truglia has already served the custodial sentence for that offense and any additionall punishment would violate the Double Jeopardy of the Constitution.   Conversely, using the guise of a "re-sentencing" to sanction Mr. Truglia for willful failure to pay restitution would deny Mr. Truglia his due process rights.  The Court would be re-sentencing him for wire fraud based on alleged now for conduct for which he has not been indicted, let alone convicted after a fair trial by a jury of his peers.

Mr. Truglia has already been severely punished by the Court for his supposed failure to honor his restitution obligations.  He has served more than 13 months in prison, much of it at the notorious Metropolitan Detention Center.  He has turned over every asset in his possession, other than a fraction of a Bitcoin.

A sentence of any more time in prison would be a pointless exercise in vengeance.  Such a punishment will not help Mr. Terpin get back any more of his money.  Until and unless Mr. Truglia gains access to his Bitcoin wallet, he has no way of paying Mr. Terpin back.  No amount of prison time is going to change that reality.

When the Court sentenced Mr. Truglia in 2022, it considered all of the Sec. 3553(a) factors and determined that an 18 month sentence was sufficient, but not greater than necessary.   All of the mitigating factors considered by the Court still apply.  Now that Mr. Truglia has served an additional 13 months, any sentence other than time served would be a grave injustice.

Respectfully submitted,

Mark B. Gombiner
Allegra Glashausser
Attorneys for Nicholas Truglia

cc: AUSA Timothy Capozzi

13